**Allen L. CHICKERING, Jr., William M. Caldwell, William G. Henshaw, W. H. Keeney and William T. Pascoe, III, Plaintiffs,**

v.

**James P. GILES, Victor H. Palmieri, Don L. Rogers, Bernard A. Schriever, Roland R. Speers, John W. Sweetland, Clarence Wolf, Jr., Robert B. Wolf, American Cement Corporation, a Delaware corporation, Defendants.**

Court of Chancery of Delaware, New Castle.

Aug. 28, 1970.

S. Samuel Arsht, Morris, Nichols, Arsht & Tunnell, Wilmington, and William I. Edlund, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiffs.

Richard F. Corroon and Robert K. Payson, Potter, Anderson & Corroon, Wilmington, and Everett B. Clary, O'Melveny & Myers, Los Angeles, Cal., for defendants.

Henry M. Canby and Richard F. Balotti, Richards, Layton & Finger, Wilmington, and Daniel L. Rothman, Fierstein, Dolin & Rothman, Los Angeles, Cal., for objectors.

DUFFY, Chancellor:

This is the decision on a joint petition for approval of settlement of a derivative action after notice to stockholders and a hearing on objections.

I

The complaint alleges that plaintiffs are directors and stockholders of American Cement Corporation (American) and that defendants are or claim to be directors of that Company. Defendant James P. Giles was also president of American.

The complaint, filed on April 2, 1969, avers that defendants engaged in a scheme and conspiracy to perpetuate their control of American, to retain Giles as president and to exercise the powers of their respective offices in their own personal interests. Various specific acts in support of the conspiracy are alleged. Plaintiffs prayed for an accounting as to any loss sustained by the Corporation as a result of the conspiracy, and an injunction to restrain American from completing an agreement with Mastan Company, (a subsidiary of Franchard Corp.) under which 675,000 treasury shares would be exchanged for stock of Mastan. On May 27 defendants answered, denying generally the allegations of the complaint and stating that policy differences existed between the two groups on the Board of Directors.

## II

When the complaint was filed the two director groups were battling on many fronts, including the courts in California and Delaware.[1] A settlement was reached and the agreement thereto was filed simultaneously with defendants' answer. Notice was then given in accordance with Rule 23(c), Del.C.Ann., and objectors appeared in opposition to the terms of settlement.

Under those terms American is to pay sums totaling about $1,900,000 for expenses incurred by both groups in prosecuting the various actions and in getting ready for more. The agreement recites actions to be taken by the parties in settling their differences, including payment of severance allowances, salaries of officers discharged and reinstated, legal fees and expenses incurred (by each side) in connection with a contemplated proxy fight, legal fees and expenses incurred in connection with a suit filed against William M. Caldwell (by American), Caldwell's expenses in defending the suit, consulting fees and salaries paid to various defendants formerly active with the Company, the making of consultant agreements, and so on.

As this indicates, the terms of settlement are many but the agreement is founded on two premises: (a) all defendants leave active management and (b) American pays all expenses incurred by both groups in the intra-corporate shoot-out.

The parties argue from many premises which I shall not catalogue. The objectors make two points which are basic and go at once to the question of whether judicial approval should be given in any event: they say that the settlement has already been consummated without such approval and the issues posed by the action are moot. I agree.

## III

On a petition to approve settlement of a derivative suit the Court's function is to consider contested issues, not those which have been made moot by the parties or by events. In this action plaintiffs put two basic claims before the Court: (a) defendants wrongly proposed to have American issue 675,000 treasury shares to Franchard and, (b) defendants "engaged in a scheme and conspiracy to perpetuate their control of American Cement and to retain Giles as President—and to exercise the powers of their respective offices in their own personal interests". As to the first of these, the petition for approval states that:

> "American and Franchard Corp. have terminated negotiations with respect to the acquisition of Mastan Company by American, and no stock or other consideration has been given or will be given by American in connection therewith. This renders moot that portion of the above-entitled action which challenges the Mastan acquisition."

While dismissal of this action may depend upon Court approval, the only reasonable conclusion from this language (and the entire record) is that termination of the Mastan acquisition does not. The parties to the petition, not by agreement alone but by

---

1. See, for example, Henshaw v. American Cement Corporation, Del.Ch., 252 A.2d 125 (1969).

action taken to implement it, have, as they say, rendered "moot" this issue.

The issue as to perpetuation of control of American is in precisely the same situation: the joint petition states that:

"members of the Management Group no longer constitute a majority of the Board of Directors, and the new Board is in a position to effect, and has effected, such changes in the by-laws of American and in the constituency of the Committees of the Board as they may deem to be in the best interest of American."

And so, the joint petition continues "the changes in corporate structure complained of in the above-entitled action have been rescinded by the new Board". Again, by action (and not by mere agreement) the parties have made the issue moot.

In sum, this shows quite clearly that the parties to the settlement have implemented it in such a way as to render moot, in fact, the issues tendered by the complaint. And the only reasonable conclusion from the entire record is that they will remain moot whether or not the Court judicially approves the settlement.

Proponents argue that it is the settlement which has resolved these issues and made them moot. They say the issues are not moot independent of the settlement.

Rule 23.1 provides that a derivative action

"shall not be dismissed or compromised without the approval of the court, and notice by mail, publication or otherwise of the proposed dismissal or compromise shall be given to shareholders or

members in such manner as the court directs."

The differences between plaintiffs and defendants were settled after an agreement was signed and before hearing was held. (Indeed many of the acts of settlement took place before the petition for approval was filed.) Thus, for example, defendants Rogers, Speers and Sweetland were required to resign as directors and their employment by American was terminated. They were given severance pay totaling some $150,000. Giles resigned as president and began a five-year period as "special consultant" (at $50,000 annually). Some of the plaintiffs and persons associated with them, all of whom had been ousted by the Giles group from employment, were re-hired with full back pay and restoration of benefits. American paid legal expenses ($50,000) incurred by plaintiff Caldwell in defending American's suit against him, together with costs and expenses which he incurred ($72,000), and expenses incurred by plaintiff Henshaw in his action against American to secure a stock list ($58,817), to engage in a proxy contest ($143,075), and on and on. An exhibit to the joint petition for approval of settlement lists some eleven pages of expenses paid by American as part of the settlement.[2]

In a given case the parties may be faced with an emergency or facts which compel action before the Court can give notice or hold a hearing on a settlement petition. See for example Masterson v. Pergament, 203 F.2d 315 (6 Cir. 1953). But the proponents have shown neither facts which compelled execution of the settlement before hearing nor law to support what they did.

2. The proponents, relying on Dann v. Chrysler Corporation, 41 Del.Ch. 438, 198 A.2d 185 (1963) and Auerbach v. Cities Service Company, 36 Del.Ch. 554, 134 A.2d 846 (1957) argue that the Court can approve the settlement without approving with *res judicata* effect each item of expenditure by American. The fairness of the settlement "considered as a whole" is a common test for approval.

But it does not follow that the Court does not look to negative factors. On the contrary, the Chancellor did just that in *Dann*. He had one payment to consider, here the proponents have crammed eleven pages of payments into this settlement and have said, in effect, that it makes no difference (for present purposes) whether they are negative factors. I do not agree.

Certain it is that a prime purpose of Rule 23.1 is to give the Court meaningful supervision of a derivative settlement and to prevent abuse (such as paying plaintiff and/or his counsel to discontinue). This is designed to permit, and require, judicial supervision of both dismissal *and* compromise of a derivative suit. If the Court is to meet its obligation it must not be faced with the kind of *fait accompli* which the proponents have managed here. And notice to stockholders of the "proposed" dismissal or "proposed" compromise, which the Rule requires, will itself be mooted if parties are free, without waiting for notice, hearing or Court approval, to put through settlement of a claim which belongs to none of them except the beneficiary corporation. And, American has even paid plaintiffs' counsel fees ($34,-408.00) for prosecuting this action and the Court has not been asked as yet to consider plaintiffs' right to fees.

\* \* \*

The issues tendered by the complaint have been made moot by the action of the proponents in implementing, without Court approval, the agreement which they made. Court approval would add nothing to the "settlement" and under the circumstances I decline to approve it.[3]

---

3. As to issues, proponents argue that this case resulted from an internal management dispute at American over corporate policy and goals. The complaint filed April 2, 1969 says nothing of this. Plaintiffs' memorandum in support of a motion for a restraining order, filed April 2, 1969, says nothing of this. The memorandum of agreement between plaintiffs and defendants, dated April 4, 1969 says nothing of this. Those documents reflect a power fight for corporate control. The contention as to policy disputes was brought into the case for the first time on May 27, 1969 when defendants answered and, at the same time, the petition for approval of the settlement was filed.